In the Matter of the Estate of Leonard Kebler, Deceased. National Bank of Westchester et al., as Trustees under the Will of Leonard Kebler, Deceased, et al., Respondents; Ruth K. Holbrook, Appellant. In the Matter of the Estate of Edythe A. Kebler, Deceased. National Bank of Westchester et al., as Executors and Trustees of Edythe A. Kebler, Deceased, et al., Respondents; Ruth K. Holbrook, Appellant.

Ughetta, Acting P. J., Brennan, Rabin and Munder, JJ., concur; Benjamin, J. dissents and votes to reverse the decrees and to remit for a new hearing, with the following memorandum: In January, 1967, after a hearing, the Surrogate approved the trustees' proposed agreement to sell the major assets of two trusts (some 41,000 shares of the stock of Ward Leonard Electric Co.) to four buyers, one of whom is cotrustee John Armstrong Kebler; the four buyers are all key personnel of Ward Leonard. The price to be paid was $10 per share; $225,040 was to be paid within 90 days; the balance of $183,390 was to be paid in five equal annual installments, with such payments secured by noninterest-bearing promissory notes and the deposit of some 9,000 shares of Ward Leonard stock as security. The stock to be sold constitutes about 90% of the assets of two trust estates, of which Ruth Kebler Holbrook was substantially the sole income beneficiary. In one trust estate the cotrustees are John A. Kebler and the National Bank of Westchester; in the other, the cotrustees are John A. Kebler, the National Bank of Westchester, and Edythe A. Tenney. The beneficiary, Ruth Holbrook, is the sister of trustee John A. Kebler. When the proposed contract of sale was first made in June, 1966, the stock of Ward Leonard (publicly sold in the over-the-counter market) was quoted at 10½ bid. When the hearing was held before the Surrogate, in October, 1966, the stock was quoted at 11⅝ bid. While this appeal was pending the bid price rose to 13½ in February, 1967, 18½ at the end of March, 1967, and 27 on June 23, 1967. The dramatic rise in price is attributable not so much to any upward trend in the market, as to sharply increased earnings reported by Ward Leonard. In 1964–65, for example, Ward Leonard earned 1 cent; in 1965–66, it earned $2.20; for the 1st half of 1966–67 it earned $1.67. The 1965–66 earnings of $2.20 were reported 3 days before the hearing held by the Surrogate in this matter. The application to the Surrogate for approval of this sale originally was made and concurred in by all the trustees; it was not opposed by the special guardian appointed for four infant contingent remaindermen; it was bitterly opposed by Ruth Holbrook, the income beneficiary, on the grounds, *inter alia,* that the price of $10 per share was inadequate and the method of payment was imprudent. When the appeal was first submitted to the Appellate Division on February 28, 1967, all the cotrustees urged affirmance of the order approving the sale; the special guardian urged affirmance, but qualified his position by stating that he would support a better offer if one could be obtained; appellant Ruth Holbrook (the trust beneficiary) strongly urged reversal and disapproval of the agreement. While the appeal was pending undetermined and on April 14, 1967, respondent John A. Kebler moved in the Appellate Division for an order extending the closing date of the agreement to the date of entry of the order of the court of last resort of this State. His motion was opposed not only by appellant Ruth Holbrook, but also by the special guardian and by John A. Kebler's cotrustees, the National Bank of Westchester and Edythe A. Tenney. The special guardian and the cotrustees apparently had had a change of heart, in view of the continued rise in Ward Leonard's earnings and the open-market price of its stock, and they all now took the position that perhaps the proceeding should be reopened for further proof as to the value of the stock, since the $10 offer now seemed woefully inadequate. On this record, it seems clear to me (a) that it was an unwise exercise of discretion for the

Surrogate to approve the sale agreement on the proof then before him; and (b) that even if it were a provident exercise of discretion by the Surrogate on the facts then before him, subsequent developments have made it imperative that we reopen the proceedings for further proof and a determination *de novo*. The proof before the Surrogate showed that the $10 offer was made on June 28, 1966, one month before the end of Ward Leonard's fiscal year of 1965–66; that the earnings for that fiscal year were $2.20 (as compared with the previous year's earnings of one cent), but that information was not publicly reported until October 24, 1966; and that the offerors were all key personnel in Ward Leonard's management. Obviously, the offerors knew about the drastically improved earnings picture when they made their $10 offer, even though the public did not. Obviously, the offerors knew the price of the stock would rise (as in fact it did) when it became known that Ward Leonard had "turned the corner." Obviously, a price of $10 for stock earning $2.20 (a price-earnings ratio of only 4½) was unrealistic. On these facts (and apart from the testimony of appellants' expert that the stock was worth 17⅝ per share) a reasonable inference is that the offer of $10 per share was not made in good faith; and this inference would be particularly justified with respect to John A. Kebler, who was not only one of the offerors, but also a cotrustee of these estates. On these facts, then, I believe it was an unwise exercise of discretion for the learned Surrogate to approve the sale agreement. And if it were assumed, *arguendo*, that the approval was provident when made, it has certainly by now become improper to permit the agreement to stand. As of now, this stock is selling in the open market for almost three times the price payable under the agreement. The last reported earnings were at the rate of $3.34 a year. On the present earnings and present market price of the stock, a $10 offer is grossly inadequate. With the lone exception of John A. Kebler (who made the $10 offer and naturally wants it approved), all parties, including the special guardian and the cotrustees, now seem to agree that the offer should be rejected and the proceeding reopened for further proof and the submission of new offers. In this posture of the case, this court cannot properly sanction and place its stamp of approval on the proposed sale for $10 per share. It can and should reverse the order approving the sale and remit for a new hearing thereon in light of the facts as they now exist, even though some of those facts were not in the record before the Surrogate. It seems clear that we have the power to do so, since (a) a sale requiring judicial approval remains open for reconsideration where it appears that the price offered was inadequate and there is a reasonable prospect that a higher price can be obtained (see *Matter of 16 Ct. St.*, 270 App. Div. 761; *Empire State Development Co. v. Lambert*, 15 A D 2d 511, 936, affd. 11 N Y 2d 913); (b) Section 309 of the Surrogate's Court Act provides that "Where an appeal is taken upon the facts, the appellate court has the same power to decide the questions of fact, which the surrogate had; *and it may, in its discretion, receive further testimony or documentary evidence*". [emphasis supplied]; (c) Section 309, referring to a prior section (§ 20, subd. 6), further provides that on an appeal from an order granting or denying a new hearing for fraud, *newly discovered evidence* or other sufficient cause [emphasis supplied], "the appellate court has the same power as the surrogate, and his determination must be reviewed as if an original application were made to that court"; (d) in view of the authority granted us by section 309, we can and should consider the facts concerning the rise in the earnings of Ward Leonard and the rise in the price of its stock, which occurred after the hearing before the Surrogate, since all of them are contained in the public press and periodicals

and were brought to our attention in the papers submitted on the motion to extend the closing date for the agreement; and (e) consideration of that new evidence makes it clear that the offer of $10 per share must now be rejected and a new hearing held for the submission of further proof and possible new offers for the stock. It must be remembered that we here deal not with an adversary proceeding to determine vested rights, but with a request for an advisory opinion as to the wisdom of accepting a proposed offer. So long as the matter is *sub judice,* the court has a continuing responsibility to assure the trust beneficiary that fair value will be paid for the trust assets. Certainly, we fall far short of our duty if we allow her brother and his associates to acquire these assets for a mere fraction of their true value. [Motion No. 1118.] Motion by respondent John Armstrong Kebler for an order extending the closing date for the contract of sale of 40,843 shares (involved in Appeals Nos. 806 E and 807 E [decided contemporaneously herewith]) from April 16, 1967 (90 days from January 16, 1967, date of entry of the Surrogate's decrees) to the date of the entry of the order of the court of last resort of the State of New York. Motion denied, without prejudice to renewal before the Surrogate in any appropriate proceeding involving the question of extension of time for performance of the contract. Ughetta, Acting P. J., Brennan, Rabin and Munder, JJ., concur; Benjamin, J. concurs in the result for the reasons set forth in his dissenting memorandum on the appeals decided herewith, Nos. 806E and 807E.